<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

———————————————————— :
                                                       :
**PNY TECHNOLOGIES, INC.,**           :
                                                       :          **Civil Action No. 14-4150 (ES)**
                    **Plaintiff,**              :
                                                       :
            **v.**                                  :
                                                       :          **OPINION**
**MILLER, KAPLAN, ARASE & CO.,** :
**LLP,**                                          :
                                                       :
                    **Defendant.**            :
———————————————————— :

## I.   INTRODUCTION

This matter comes before the Court on the motion of Defendant Miller, Kaplan, Arase & Co., LLP ("MKA")[1] to transfer the proceedings to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a) or, in the alternative, to dismiss the action on the ground of forum non conveniens.  Pursuant to Federal Rule of Civil Procedure 78, the Court decided this motion without oral argument.  For the reasons set forth below, Defendant's motion is granted.  Defendant's motion to dismiss is denied as moot.

## II.   BACKGROUND

Plaintiff PNY Technologies, Inc. ("PNY") is a corporation formed under the laws of Delaware with its principal place of business in Parsippany, New Jersey.  <u>See</u> Compl., Ex. A to Notice of Removal, June 30, 2014, at ¶ 3, D.E. 1.  PNY sells USB and SD flash memory system products.  <u>See</u> <u>id.</u> at ¶ 6.  On January 2, 2008, PNY entered into a Limited Cross Patent License

---

[1] Defendant notes that Plaintiff improperly titled its name in the Complaint, and that Defendant's correct name is Miller Kaplan Arase LLP.  <u>See</u> Def.'s Ltr., Aug. 21, 2014, D.E. 10.

Agreement ("License Agreement") with SanDisk Corporation ("SanDisk"), a corporation formed under the laws of Delaware with its principal place of business in Milpitas, California.  See id. at ¶ 8; see also Third Am. Compl. in PNY Tech., Inc. v. SanDisk Corp., Ex. 2 to Def.'s Mot. to Transfer, at ¶ 13, D.E. 11.  SanDisk purports to license certain flash memory technology used in some of PNY's products.  See Compl., Ex. A to Notice of Removal, June 30, 2014, at ¶ 6, D.E. 1.  Section 5.11 of the License Agreement allows SanDisk to have an "independent Third Party accounting firm audit" PNY's compliance with its royalty obligations.  See License Agreement, Ex. 3 to Def.'s Mot. to Transfer, Aug. 21, 2014, D.E. 11-7.  Section 5.11 also provides that the independent third party auditor must sign a non-disclosure agreement and "maintain in confidence any price, cost, margin, or other financial information obtained during the course of the audit, and will not disclose such information to SanDisk or any Third Party."  See id.

In 2010, SanDisk exercised its right to conduct an audit (the "Royalty Audit") under the License Agreement, limited to the time period from January 15, 2008 through September 30, 2010.  See Compl., Ex. A to Notice of Removal, June 30, 2014, at ¶ 12, D.E. 1.  SanDisk hired Defendant MKA as the independent third party auditor.  See id.

Defendant MKA is a California limited liability partnership consisting of 22 partners who are "licensed by the California Board of Accountancy."  See id. at ¶ 4; see also Decl. of Michael Quackenbush ("Quackenbush Decl.") in Supp. of Def.'s Mot. to Transfer, Aug. 21, 2014, at ¶ 5, D.E. 11-2.  MKA maintains its principal place of business in North Hollywood, California.  See Quackenbush Decl. in Supp. of Def.'s Mot. to Transfer, Aug. 21, 2014, at ¶ 5, D.E. 11-2.  None of the Defendant's partners reside in, or are citizens of, either Delaware or New Jersey.  See Quackenbush Decl., Ex. C to Notice of Removal, June 30, 2014, at ¶¶ 5-6, D.E. 1.  Although

PNY initially expressed concerns about MKA's independence,[2] PNY consented to MKA's audit in December 2010.  See Compl., Ex. A to Notice of Removal, at ¶¶ 13-15, D.E. 1.  Accordingly, MKA performed the Royalty Audit pursuant to the Licensing Agreement.  See id. at ¶ 1.  On or about December 17, 2010, Michael Quackenbush, a partner at MKA, signed a Mutual Confidentiality and Non-Disclosure Agreement (the "NDA"), which adopted the License Agreement's confidentiality obligations, with PNY.  See id. at ¶¶ 14, 16.  Also, MKA representatives, Michael Bagsik and Yu-Ju Wu, visited PNY's Parsippany, New Jersey office twice to collect some relevant information.  See id. at ¶ 17.

On or about March 29, 2011, MKA prepared and distributed a preliminary summary report of its findings to PNY and to SanDisk.  See id. at ¶ 18.  PNY reviewed the preliminary summary report and noted that the numbers in that report were "drastically higher" than PNY's own calculations.  See id.  On April 8, 2011, pursuant to the License Agreement's terms, PNY provided MKA with written objections.  See id. at ¶ 21.  On May 11, 2011, after MKA collected additional information from PNY, MKA adjusted its calculations and sent PNY revised findings.  See id. at ¶¶ 22-23.  PNY reviewed the revisions and again expressed concerns with the report's calculations.  See id. at ¶ 24.  Accordingly, MKA reopened the audit and requested more documentation.  See id.  On June 17, 2011, MKA provided PNY and SanDisk with a final audit report.  See id. at ¶ 25.  MKA used two methods for calculating amounts owed.  See id. at ¶ 18.  The final report showed that PNY owed SanDisk $30 million under one method and $22.9 million under the second method.  See id. at ¶ 25.

---

[2] PNY expressed concern about MKA's independence because MKA is the administrator for SD-3C, LLC ("SD-3C"), a patent pool that licenses SD technology formed by SanDisk, Matsushita Electric Industrial (now named Panasonic Corporation), and Toshiba Corporation.  See Compl., Ex. A to Notice of Removal, ¶ 13, D.E. 1.

On or about July 26, 2011, SanDisk filed a lawsuit against PNY in California state court to recover royalty payments from PNY based on MKA's audit.  See SanDisk Corp. v. PNY Tech., Inc., Case No. 1-11-CV-205928 (Cal. Super. Ct.) (the "California Litigation"); see also Compl., Ex. A to Notice of Removal, at ¶ 30, D.E. 1.  In turn, PNY filed this action against MKA, alleging that MKA's audit was defective and biased, and "caused PNY to become embroiled in costly litigation."  See Compl., Ex. A to Notice of Removal, at ¶ 32, D.E. 1.  PNY claims that MKA violated the License Agreement, and thus committed breach of contract, by "shar[ing] PNY's financial information, including price information, that was obtained during the course of the Royalty Audit with SanDisk and its outside counsel."  Id. at ¶ 36.  PNY also alleges that MKA fraudulently represented that it could function as an impartial third-party auditor, and that it did not disclose MKA's working relationship with SanDisk. [3]  Id. at ¶¶ 41-42, 50-52.  In addition to the claim for breach of contract, PNY brings claims for fraud, intentional misrepresentation, negligent misrepresentation, and tortious interference with contract.  See id. at ¶¶ 41-48, 50-57, 66-68.

On June 30, 2014, MKA removed this case from the Superior Court of New Jersey, Law Division, Morris County, to the District Court of New Jersey.  See Notice of Removal, June 30, 2014, D.E. 1.  By stipulation, Defendant's time to respond was extended through August 21, 2014.  See Stipulation, July 18, 2014, D.E. 5.  On August 21, 2014, Defendant filed this motion to transfer the case to the Northern District of California.  See Def.'s Mot. to Transfer, D.E. 11-1; see also Def.'s Reply, Oct. 27, 2014, D.E. 24.  On October 13, 2014, Plaintiff opposed the

---

[3] Among other claims, PNY alleges that Michael Quackenbush, the MKA partner working on the Royalty Audit, concealed that he did about 60% of his work for SD-3C.  See Compl., Ex. A of Notice of Removal, at ¶ 14, D.E. 1.  PNY also contends that MKA withheld the information that it was the auditor for a "multi-million dollar SanDisk retirement fund" for many years.  See id.

motion.  See Pl.'s Opp'n Br., D.E. 18.

### III.   SUMMARY OF THE ARGUMENTS

MKA argues that this Court should transfer the action to the Northern District of California because the mandatory forum selection clause requires that any lawsuit related to the License Agreement between SanDisk and PNY be venued in the Northern District of California. See Def.'s Mot. to Transfer, Aug. 21, 2014, at 12, D.E. 11-1.  MKA acknowledges that it was not a signatory to the Agreement.  However, MKA argues that it has standing to enforce the clause because it is "closely related" to the underlying contractual relationship between PNY and SanDisk.  See id.  In section 7.9(a) of the License Agreement, PNY and SanDisk agreed

> (i) to submit to the jurisdiction of the United States District Court for the Northern District of California for any action properly brought pursuant to this Agreement;
> (ii) to waive any objection they may have now or hereafter to the venue of any suit brought pursuant to clause (i) above.

License Agreement, Ex. 3 to Def.'s Mot. to Transfer, Aug. 21, 2014, D.E. 11-7.  Section 7.9(d) of the License Agreement states, in relevant part, that "either Party may initiate litigation proceedings in the Northern District of California."  See id.  PNY and SanDisk also agreed that California law would govern questions of interpretation and enforcement concerning the License Agreement.  See id. at 19.  Additionally, Paragraph 8 of the NDA between MKA and PNY provides that "[t]his agreement . . . shall be governed by and construed under the laws of the State of California."  See NDA, Ex. 8 to Def.'s Mot. to Transfer, Aug. 21, 2014, D.E. 11-7.

MKA argues that because the forum selection clause constitutes a waiver to the parties' right to challenge the pre-selected forum as inconvenient, the private interest factors that courts usually analyze in motions to transfer weigh in favor of the initial forum.  See Def.'s Mot. to Transfer, at 19, D.E. 11-1.  Therefore, MKA argues, the court may consider only whether public interest factors defeat transfer.  Id.

Finally, MKA relies on the traditional analysis under 28 U.S.C. § 1404(a).  See id. at 25. MKA contends that the Northern District of California has personal jurisdiction over MKA because it maintains offices in California, including San Francisco, and thus resides there.  See id. at 26.  MKA also argues that venue is proper in the Northern District of California because a substantial portion of the events giving rise to PNY's claims occurred there.  See id.  In addition, MKA asserts that the private interest factors all support transferring this action to California, as it is more convenient for the court, the parties, and the witnesses.  See id. at 28-32.  Moreover, MKA contends that the public interest factors weigh in favor of transfer to California because all critical events giving rise to PNY's claims occurred there, and California has a greater interest in adjudicating this action.  See id. at 20-25.  See also Def.'s Reply, at 5-13, D.E. 24 (arguing that private and public interest factors of § 1404(a) favor transferring case to Northern District of California, and absent transfer, seeking dismissal without prejudice to PNY's right to refile in California).

In opposition, PNY contends that transfer is inappropriate because the License Agreement's forum selection clause does not apply here.  See Pl.'s Opp'n Br., at 4, D.E. 18. PNY argues that MKA was not a signatory to the License Agreement, and thus did not sue MKA under the License Agreement.  See id.  Instead, PNY argues that it sued MKA under the NDA. See id.

PNY also argues that MKA has not met its burden of establishing that the Northern District of California is the more convenient forum.  See id. at 5.  Specifically, PNY asserts that its choice of forum is entitled to great weight, because PNY resides in New Jersey.  See id. at 7. Moreover, PNY contends that most of its witnesses and documents upon which it intends to rely are located in New Jersey.  See id. at 8-13.  With respect to the public interest factors, PNY

asserts that New Jersey has a greater interest in adjudicating this action because PNY, the "victim," is located in this District, and thus New Jersey feels the pecuniary loss from the breach. See id. at 14-17.

## IV.   DISCUSSION

When a parties' contract contains a valid forum selection clause, federal courts are required to "transfer the case unless extraordinary circumstances unrelated to the convenience of the parties clearly disfavor a transfer."  See Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Texas, 134 S. Ct. 568, 574 (2013) ("Although a forum-selection clause does not render venue in a court 'wrong' or 'improper' under § 1406(a) or Rule 12(b)(3), the clause may be enforced through a motion to transfer under § 1404(a)").  Thus, if there is an enforceable forum selection clause that applies to the dispute before the court, it can provide the basis for proper venue.  See Magi XXI, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714, 720-21 (2d Cir. 2013).  In addition, when a § 1404 transfer is sought pursuant to a forum selection clause, the United States Supreme Court has instructed courts to give the clause controlling weight.  See Atl. Marine Constr. Co., 134 S. Ct at 581-82.  Accordingly, the court gives plaintiff's choice of forum and the convenience factors no weight.  See id.  Under these circumstances, a party can defeat transfer only if it can show that there are prevailing public interest factors, such as court congestion, or a special need to have localized controversies decided by courts familiar with the applicable law.  See id. at 581 n.6.  Therefore, this Court must first resolve whether the License Agreement's forum selection clause applies in this action.

### A.  Forum Selection Clause

Since venue and the enforcement of forum selection clauses are procedural issues rather than substantive issues, "[i]n federal court, the effect to be given a contractual forum selection

clause in diversity cases is determined by federal not state law."[4]   See Jumara v. State Farm Ins. Co., 55 F.3d 873, 877 (3d Cir. 1995); see also Wall Street Aubrey Golf, LLC v. Aubrey, 189 Fed. App'x 82, 84 (3d Cir. 2006).   In the Third Circuit, forum selection clauses are presumptively valid.   See Wall Street, 189 Fed. App'x at 85 (citing Costal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190, 202 (3d Cir. 1983)); Int'l Business Software Solutions, Inc. v. Sail Labs Tech., AG, 440 F. Supp. 2d 357, 362 (D.N.J. July 25, 2006); Cadapult Graphic Sys., Inc. v. Tektronix, Inc., 98 F. Supp. 2d 560, 564 (D.N.J. May 18, 2000). Hence, the party opposing the forum selection clause bears the burden of making a "strong showing" that the clause is unreasonable, and therefore unenforceable.   See Cadapult, 98 F. Supp. 2d at 565 (citing M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972)).

Generally, a forum selection clause is unreasonable if:  (1) it is the result of fraud or overreaching; (2) its enforcement would violate the forum's strong public policy; or (3) its enforcement would, in the particular circumstances of the case, result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable.   See Cadapult, 98 F. Supp. 2d at 565; see also Jumara, 55 F.3d at 880 (stating that "[w]here the forum selection clause is valid, which requires that there have been no fraud, influence, or overwhelming bargaining power . . . the plaintiffs bear the burden of demonstrating why they should not be bound by their contractual choice of forum") (internal quotation marks omitted).

Here, PNY does not challenge the forum selection clause's validity.  Instead, PNY argues that MKA cannot invoke the forum selection clause, as it was "not a signatory to the License

_____

[4] While federal law is applied when determining the effect of a forum selection clause, state law is applied when construing the terms of a forum selection clause.  See Wall Street Aubrey Golf, LLC v. Aubrey, 189 Fed. App'x 82, 85 (3d Cir. 2006); Bel-Ray Co., Inc. v. Chemrite (Pty.) Ltd., 181 F.3d 435, 441 (3d Cir. 1999).

Agreement." <u>See</u> Pl.'s Opp'n Br., at 4, D.E. 18.  However, PNY acknowledges that the License Agreement required an "independent Third Party," to conduct an audit, and that under those provisions, SanDisk retained MKA.  <u>See id.</u>  PNY also makes a distinction between the License Agreement and the NDA.  <u>See id.</u>  Specifically, PNY contends that it did not sue MKA under the License Agreement because it is not a party to that agreement; instead, PNY sued MKA pursuant to the NDA.  <u>See id.</u>  PNY therefore argues that the License Agreement's forum selection clause does not apply in this case.

The Third Circuit has held that a forum selection clause will still bind a third-party non-signatory if the signatory and non-signatory are so closely related that invoking the clause is foreseeable.  <u>See, e.g.</u>, <u>D'Elia v. Grand Caribbean Co., Ltd.</u>, No. 09-1707, 2010 WL 1372027, at *3 (D.N.J. Mar. 20, 2010) ("In the Third Circuit, a non-signatory party may enforce a forum selection clause in a contract if the party . . . is closely related to the contractual relationship or dispute such that it is foreseeable that the party will be bound."); <u>First Fin. Mgmt. Grp., Inc. v. Univ. Painters of Balt., Inc.</u>, No. 11-5821, 2012 WL 1150131, at *3 (E.D. Pa. Apr. 5, 2012) (providing that it is "widely accepted that non-signatory third-parties who are closely related to [a] contractual relationship are bound by forum selection clauses contained in the contracts underlying the relevant contractual relationship."); <u>Drucker's, Inc. v. Pioneer Electronics (USA), Inc.</u>, No. 93-1931, 1993 WL 431162, at *7 (D.N.J. Oct. 20, 1993) ("Third Circuit[] . . . [has] determined that 'a range of transaction participants, parties and non-parties,' should benefit from and be subject to forum selection clauses.").  A non-signatory party is "closely related to a dispute if its interests are completely derivative of and directly related to, if not predicated upon the signatory party's interests or conduct."  <u>Weingard v. Telepathy, Inc.</u>, No. 05-2024, 2005 WL 2990645, at *5 (S.D.N.Y. Nov. 27, 2005) (internal quotation marks omitted).

For example, in <u>Cambridge Mgmt. Grp., LLC v. Baker</u>, Plaintiff Cambridge Management Group, LLC ("Cambridge") sued, among others, Defendants Horace Ruble Baker, IV and his wife Sheila Baker (collectively, the "Baker Defendants"), as well as Warner R. Wilson, Jr., and the law firm of Wilson and Epstein, LLC, (collectively, the "Wilson Defendants") based on a litigation funding agreement ("Funding Agreement") between Cambridge and the Baker Defendants.  No. 12-3577, 2013 WL 1314734, at *1 (D.N.J. Mar. 28, 2013).  Cambridge was a financial enterprise that advanced money to plaintiffs involved in personal injury litigation in exchange for purchasing a portion of such litigation's potential proceeds.  <u>See</u> <u>id.</u> at *4.  The Baker Defendants were plaintiffs in a personal injury lawsuit in Georgia state court.  <u>See</u> <u>id.</u> Cambridge provided the Baker Defendants with an advance for their personal injury lawsuit. <u>See</u> <u>id.</u>  The Baker Defendants retained the Wilson Defendants to represent them in their state court action.  <u>See</u> <u>id.</u>  Pursuant to the Funding Agreement, Cambridge provided the Baker Defendants and the Wilson Defendants with a set of agreements, including an Agreement to Pay, an Attorney Acknowledgement, and an Irrevocable Lien (collectively, the "Contract").  <u>See</u> <u>id.</u> The Agreement to Pay contained a forum selection clause, which provided that all disputes be arbitrated in New Jersey.  <u>See</u> <u>id.</u> at *5.  Cambridge brought an action against the Baker Defendants and the Wilson Defendants in New Jersey for failing to pay according to the Funding Agreement and sought to compel all defendants to arbitrate.  <u>See</u> <u>id.</u> at *1.  The Wilson Defendants asserted that the forum selection clause did not apply to them because they had signed only the Attorney Acknowledgement, and not the Agreement to Pay.  <u>See</u> <u>id.</u> at *7.

The <u>Cambridge</u> court rejected the Wilson Defendants' challenge to the forum selection clause.  <u>See</u> <u>id.</u> at *11.  The court concluded that the Wilson Defendants' conduct was "closely and directly related" to the Funding Agreement because:  (1) the Wilson Defendants expressly

acknowledged receiving the Agreement to Pay and agreed to distribute funds "in accordance with the terms of all Agreements signed" by signing the Attorney Acknowledgement; (2) the Agreement to Pay stated that the Attorney Acknowledgement was part of the overall agreement; (3) the Irrevocable Lien explicitly identified the Wilson Defendants; and (4) the Agreement to Pay specifically referenced the Attorney Acknowledgement.  See id. at *9-11.  Thus, given the "interdependent nature of these documents," and that the Funding Agreement "unequivocally required [the Wilson Defendants'] direct involvement," the court found that it was foreseeable that the Contract's terms, including the forum selection clause, would bind the Wilson Defendants.  See id. at *11.

However, a non-signatory party is not closely related to the contracting parties' relationship if the contract neither mentions the non-signatory party nor sets forth any of the non-signatory party's obligations.  For example, in Donachy v. Intrawest U.S. Holdings, Inc., eleven individuals (collectively, the "plaintiffs") purchased condominium units in a luxury resort on the island of Turks and Caicos ("TCI") from Cherokee Limited ("Cherokee"), the condominium's developer.  No. 10-4038, 2011 WL 2973543, at *1 (D.N.J. July 21, 2011).  Defendants Intrawest U.S. Holdings and Playground Destination Properties' (collectively, the "Defendants") marketed and sold the units to the plaintiffs.  See id.  Each plaintiff who purchased a unit signed a contract with Cherokee (collectively, the "Agreements"), which contained a mandatory forum selection clause that any litigation be venued in TCI.  See id. at *1, 2.  Cherokee later filed for bankruptcy; as a result, the plaintiffs sued the Defendants to recover their deposits and other out-of-pocket losses.  See id. at 1.  Defendants argued that the Agreements' mandatory forum selection clause applied to them because they:  (1) marketed and sold the units; (2) persuaded the plaintiffs to purchase the units; and (3) were paid for their services.  See id. at *1, 2.  Thus, the Defendants

11

contended that they were "closely related to the contractual relationship" between the plaintiffs and Cherokee.  See id. at *2.

The Donachy court disagreed and concluded that the Defendants could not invoke the forum selection clause because:  (1) the Agreements did not mention the Defendants; (2) the Agreements did not "assign[] obligations" to the Defendants; and (3) the Agreements' execution did not depend on the Defendants' services.  See id. at *3.  The court therefore held that the non-signatory Defendants did not demonstrate that they were closely related to the contractual relationship between the plaintiffs and Cherokee.  See id. at *4.

Here, MKA's conduct is closely related to the underlying contractual dispute.  As a result, the License Agreement's forum selection clause binds MKA.  The License Agreement determines PNY and SanDisk's relationship, and any other relationship that may arise from the License Agreement's terms.  Specifically, to ensure PNY's compliance with its royalty obligations to SanDisk and to protect PNY's confidentiality, the License Agreement provides that an "independent Third Party accounting firm" may audit PNY's compliance.  See License Agreement, Ex. 3 to Def.'s Mot. to Transfer, at 13 § 5.11, D.E. 11-7.  Although the License Agreement does not explicitly identify MKA as the auditor, it defines all of MKA's responsibilities.  See id.  For instance, the License Agreement outlines the procedures to resolve any objections that PNY may have to the auditor's findings.  See id. at 14 § 5.13.  Also, the engagement letter between SanDisk and MKA sets forth that the "nature and limitations of the services" MKA provides must conform to the License Agreement's "agreed upon procedures," and dictates that MKA would be paid at a "blended rate of $150 per hour plus out-of-pocket expenses" to perform the Royalty Audit.  See Engagement Agreement, Aug. 26, 2010, Ex. 7 to Def.'s Mot. to Transfer, D.E. 11; see also Affiliated Mtg. Protection, LLC v. Tareen, No. 06-

12

4908 (DRD), 2007 WL 203947, at *1 (D.N.J. Jan. 24, 2007) (holding that the forum selection clause applies to third party non-signatory employees who financially benefitted from the parties' contractual relationship).  In short, the License Agreement dictates the scope of MKA's work on the audit and its remuneration for that work.  Thus, the License Agreement here differs from the agreement at issue in <u>Donachy</u>, which did not "assign[] obligations" to the non-signatory defendants.  <u>See</u> <u>Donachy</u>, 2011 WL 2973543, at *3.

This License Agreement is similar to <u>Cambridge</u>, where the Agreement to Pay stated that the Attorney Acknowledgement was part of the overall agreement.  <u>See</u> <u>Cambridge</u>, 2011 WL 2973543, at *10.  Here, the License Agreement identifies the NDA as part of the overall agreement.  <u>See</u> License Agreement, Ex. 3 to Def.'s Mot. to Transfer, D.E. 11-7.  Specifically, Section 5.11 mandates that the auditor "will sign the non-disclosure agreement."  <u>See</u> <u>id.</u> at 13.  Further, the NDA explicitly refers to the guidelines in Section 5.11.  <u>See</u> NDA, Ex. 8 to Def.'s Mot. to Transfer, D.E. 11-7.  Thus, by signing the NDA, MKA expressly acknowledged the License Agreement and its terms.  Because of the License Agreement and the NDA's "interdependent nature," it is therefore foreseeable that the License Agreement's forum selection clause would bind MKA.  <u>See</u> <u>Cambridge</u>, 2011 WL 2973543, at *11.

Moreover, the underlying action between PNY and SanDisk for breach of the License Agreement "unequivocally required" MKA's "direct involvement."  <u>See</u> <u>Cambridge</u>, 2011 WL 2973543, at *11.  The License Agreement specifically reserved to SanDisk the right to engage a third-party auditor (i.e., MKA) to determine whether PNY satisfied its royalty payments according to the License Agreement's terms.  <u>See</u> License Agreement, Ex. 3 to Def.'s Mot. to Transfer, D.E. 11-7.  Thus, MKA is integral to the License Agreement's proper execution.  Even in opposing the motion, PNY concedes, through its Principal Accounting Officer and Principal

Financial Officer, that MKA's "flawed audit resulted in a dispute between PNY and SanDisk about the amount of royalties that PNY owed to SanDisk, and SanDisk sued PNY in California state court for breach of the License Agreement."  See Decl. of Mark Ciano ("Ciano Decl.") in Supp. of Pl.'s Opp'n Br., at ¶ 13, D.E. 18-2; see also Compl., Ex. A to Notice of Removal, at ¶ 30, D.E. 1.  PNY also admits that "this case centers around [MKA]'s audit of PNY."  See Pl.'s Opp'n Br., at 4, D.E. 18.  Because MKA's duties and interests as the "independent Third Party accounting firm" arise from the License Agreement, MKA is closely related to the contractual relationship between SanDisk and PNY.  See License Agreement, Ex. 3 to Def.'s Mot. to Transfer, D.E. 11-7; Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1299 (11th Cir. 1998) (quoting Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1297 (3d Cir. 1996)) (affirming the trial court's holding that because the third-party non-signatory spouses' interests are derivative of and thus "directly related to, if not predicated upon" those of the signatory plaintiffs, the choice of law and forum selection clauses bind the spouses).  The Court thus finds that both parties should have foreseen invoking the forum selection clause.  See D'Elia, 2010 WL 1372027, at *3. Accordingly, pursuant to Section 7.9(a) of the License Agreement, MKA and PNY must "submit to the jurisdiction of the United States District Court for the Northern District of California" and "waive any objection . . . to the venue."  Cf. Drucker's, Inc., 1993 WL 431162, at *8 ("To find otherwise, the Court 'would permit [a plaintiff] to sidestep a valid forum selection clause simply by naming [as a defendant] a closely related party who did not sign the clause[.]'").

### 1.  Public Interest Factors

Because the forum selection clause applies and the Court must give the clause "controlling weight," only public interest factors can prevent transferring this matter to the Northern District of California.  See Atl. Marine, 134 S. Ct. at 581-85.  Hence, the Court must

consider whether transfer would result in easy, expeditious, or less expensive litigation.  See Jumara, 55 F.3d at 879.  The "public interests" factors include:  (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty arising from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable law.  See Jumara, 55 F.3d at 879-80.  Balancing these factors also weigh in favor of transferring this case to the Northern District of California.

### i.  Enforceability of any Judgment Obtained

Only PNY addresses the enforceability of any judgments.  See Pl.'s Opp'n Br., at 16, D.E. 18.  However, in the event that PNY prevails, it will be easier to obtain a judgment over MKA in California because MKA resides in that state.  See United States ex rel Groundwater Tech., Inc. v. Sevenson Envtl. Servs., Inc., No. 00-311, 2000 WL 33256658, at *5 (D.N.J. 2000) (recognizing that it is easier to enforce a judgment obtained in a defendant's home state).  Thus, the Court finds this factor favors transfer.

### ii.  Factors 2-6

The Court next considers whether the remaining public interest factors weigh in favor of transfer.  Although the allegedly injured party is a New Jersey corporation, the Court finds that transfer to the Northern District of California will allow for an easier, more expeditious, and less expensive litigation.  See Jumara, 55 F.3d at 879.  For example, transfer to California will alleviate administrative difficulties because there have already been two related actions in California.  See Compl, Ex. 11 to Def.'s Mot. to Transfer, D.E. 11-8.   In July 2011, SanDisk filed an action in Santa Clara County Superior Court, Case No. 1-11-CV-205928 against PNY for failing to pay royalties.  See id.  The parties subsequently settled.  See Ex. A to Pl.'s Opp'n

Br., D.E. 18-1; Ex. 20 to Def.'s Reply, D.E. 24-1; Ex. 21 to Def.'s Reply, D.E. 24-1.

Additionally, PNY sued SanDisk in the Northern District of California, asserting violations of

antitrust laws.  See Def.'s Mot. to Transfer, at 10, D.E. 11-1; Ciano Decl. in Supp. of Pl.'s Opp'n

Br., at ¶ 14, D.E. 18-2.  Although those cases do not name MKA as a party, SanDisk sued PNY

based on MKA's Royalty Audit.  See id. at ¶ 13.  Because the nature of PNY's claims against

MKA directly relate to MKA's work for SanDisk, this case will inevitably involve some of the

same issues, witnesses, and evidence as the previously litigated cases in California.  Indeed, PNY

concedes that MKA representatives acted as witnesses in the California state case.  See Ciano

Decl. in Supp. of Pl.'s Opp'n Br., at ¶ 13, D.E. 18-2.  Thus, this weighs in favor of transferring

this case to California.  See Burger King Corp. v. Stroehamann Bakeries, Inc., 929 F. Supp. 892,

895 n.2 (E.D. Pa. June 18, 1996) (stating "the existence of a related action in the transferor or

transferee district is a strong factor in a transfer decision where judicial economy can be

achieved and duplicative litigation, with possibly inconsistent results, avoided by consolidations

of actions, or by coordination of discovery and other pretrial proceedings").

     With respect to the other public interest factors, namely the local interest in having a

matter adjudicated at home and the familiarity of the forum court with the applicable law, the

Court finds that none of these factors weighs in favor or against transfer.  Both New Jersey and

California have ties to this action and thus both states have a local interest in adjudicating this

dispute.  For example, this case involves businesses from New Jersey and California.  New

Jersey and California courts thus share an interest in presiding over this case.  Accordingly,

given the presence of similar cases in California and the neutrality of the remaining factors, the

public interest factors support transfer to the Northern District of California.

     Thus, after considering whether the public interest factors are sufficient to defeat the

"controlling weight" of the forum selection clause, see Atl. Marine, 134 S. Ct. at 581-85, this Court agrees with MKA that this action is governed by the License Agreement's forum selection clause.  MKA and PNY must therefore "submit to the jurisdiction of . . . the Northern District of California for any action properly brought pursuant to" the License Agreement.  See License Agreement, Ex. 3 to Def.'s Mot. to Transfer, D.E. 11-7.

Nevertheless, even if the License Agreement's forum selection clause does not apply to this action, the Court still finds that this case should be transferred to the Northern District of California pursuant to Section 1404(a).

### B.  Transfer

Section 1404(a) permits a district court "[f]or the convenience of parties and witnesses, [and] in the interest of justice" to transfer an action to another district "where it might have been brought."  Abrams v. Gen. Nutrition Cos., Inc., No. 06-1820, 2006 WL 2739642, at *8 (D.N.J. Sept. 26, 2006) (citing 28 U.S.C. § 1404(a)).[5]  Thus, "[t]he first step in a court's analysis of a transfer motion is to determine whether [personal jurisdiction and] venue would be proper in the transferee district."  Marino v. Kent Line Int'l, No. 02-4488, 2002 WL 31618496, at *2 (E.D. Pa. Nov. 20, 2002) (citing Pro Spice, Inc. v. Omni Trade Group, Inc., 173 F. Supp. 2d 336, 339 (E.D. Pa. 2001)).  The movant bears the burden of demonstrating that transfer is warranted.  Abrams, 2006 WL 2739642, at *8; see also Jumara, 55 F.3d at 879 (citations omitted); American

---

[5] The Court may transfer a case even when it lacks personal jurisdiction over defendants. See 28 U.S.C. §§ 1404, 1406(a), 1631; see also Goldlawr, Inc. v. Heiman, 369 U.S. 463, 465 (1962) (observing that "nothing in [its] language indicates that the operation of [28 U.S.C. § 1406(a)] was intended to be limited to actions in which the transferring court has personal jurisdiction over the defendants"); Verissimo v. Immigration and Naturalization Servs., 204 F. Supp. 2d 818, 820 (D.N.J. June 14, 2002) (recognizing that "a court may transfer a matter under 28 U.S.C. § 1406 to a court with personal jurisdiction over the defendant and where venue is appropriate").

Tel. & Tel. Co. v. MCI Comm. Corp., 736 F. Supp. 1294, 1305 (D.N.J. 1990) (stating "the burden is on the moving party to show the proposed alternate forum is not only adequate but also more convenient than the present forum").  Moreover, the party seeking transfer should support its motion with affidavits and other documentation that establish that the interests of justice and convenience of the parties would best be served by a transfer.  See Plum Tree, Inc. v. Stockment, 488 F.2d 754, 756-57 (3d Cir. 1973).

If the first prong of the inquiry is satisfied, the Court must undertake a "flexible and individualized analysis," balancing a series of private and public factors to determine whether transfer is appropriate.  See Marino, 2002 WL 3168496, at *2 (citing Jumara, 55 F.3d at 879)); see also Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29 (1988).  Section 1404(a) provides three factors for consideration:  (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice.  28 U.S.C. § 1404(a).

In Jumara, the Third Circuit noted that "there is no definitive formula or list of factors" that a court must examine, and it identified private and public factors to be considered to determine if a case would more conveniently proceed in another venue.  See 55 F.3d at 879.  The "private interests" factors include:  (1) plaintiff's choice of forum; (2) defendant's preference; (3) where the claim arose; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses; and (6) the location of books and records.  See Jumara, 55 F.3d at 879.  The "public interests" factors include:  (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty arising from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable law.  See id. at 879-80.

### 1.  Filing of this Action in California

The Court must consider whether the instant action could have been brought in California.  See Abrams, 2006 WL 2739642, at *8 (citing 28 U.S.C. § 1404(a)).  Specifically, the Court must examine where the case might have been brought as of the case's filing date.  See Lafferty v. St. Riel, 495 F.3d 72, 77 (3d Cir. 2007).

### i.  Jurisdiction

Here, MKA satisfies its burden of showing that California can properly exercise personal jurisdiction over MKA.  Personal jurisdiction may be exercised under two distinct theories: general or specific jurisdiction.  Weber v. Jolly Hotels, 977 F. Supp. 327, 331 (D.N.J. Sept. 12, 1997).  The Supreme Court recently clarified that courts may assert general jurisdiction over a corporation if that corporation's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."  Daimler AG v. Bauman, 134 S.Ct. 746, 751 (2014).  Regarding corporations, "the place of incorporation and principal place of business are [paradigm] bases for general jurisdiction."  Id. at 760.  For example, in Daimler, the Supreme Court concluded that no general jurisdiction existed where the subsidiary of an Argentinian company was neither incorporated in California nor did business in that state.  See 134 S.Ct. at 761-62.

To determine whether specific jurisdiction may be exercised, the Third and Ninth Circuits have suggested a three-factor test:  (i) the defendant must have "purposefully directed" its activities at the forum state; (ii) the plaintiff's claim must "arise out of or relate to" at least one of the defendant's specifically directed activities in the forum state; and (iii) the courts may analyze other factors "to ensure that the assertion of jurisdiction otherwise "comport[s] with fair play and substantial justice" and is "reasonable."  Marten v. Godwin, 499 F.3d 290, 296 (3d Cir.

2007) (internal quotations and citations omitted); <u>see also</u> <u>Flynt Distributing Co., Inc. v. Harvey</u>, 734 F.2d 1389, 1393 (9th Cir. 1984).

In this case, MKA asserts that general and specific jurisdiction may be exercised in California because:  (i) MKA is a California limited liability partnership with its principal place of business in that same state; (ii) MKA released the final report of the audit in San Francisco, California; and (iii) PNY's claims against MKA arise from events occurring in California, including the alleged breach of the NDA.  <u>See</u> Quackenbush Decl. in Supp. of Def.'s Mot. to Transfer, at ¶¶ 5, 6, 14, D.E. 11-2.

First, California clearly has general jurisdiction over MKA.  MKA's headquarters is in California.  <u>See</u> Compl., Ex. A to Notice of Removal, June 30, 2014, at ¶ 4; <u>see also</u> Quackenbush Decl. in Supp. of Def.'s Mot. to Transfer, Aug. 21, 2014, at ¶ 5, D.E. 11-2. Further, all of MKA's partners reside there and are regulated by the California Board of Accountancy.  <u>See</u> Quackenbush Decl. in Supp. of Def.'s Mot. to Transfer, at ¶ 5, D.E. 11-2.

Regarding partnerships, Third Circuit precedent holds that courts "must attribute the contact of any one individual [partner] to all of the [partners]."  <u>Miller Yacht Sales, Inc. v. Smith</u>, 384 F.3d 93, 95 n.1 (3d Cir. 2004).  In other words, in a partnership, one partner's contacts with the forum state can form the basis for the court's exercising personal jurisdiction over all other partners.  MKA is a California partnership, so the Court will also look to California law to determine whether partners' actions can bind the partnership.  <u>See, e.g.</u>, <u>Queens Syndicate Co. v. Herman</u>, 691 F. Supp. 2d 283, 286-87 (D. Mass. Mar. 9, 2010) (considering New York law where partnership was formed to answer same question).  Generally, California courts have followed the "traditional law of partnership whereby the acts of the partnership—and/or its partners—can bind all general partners."  <u>See, e.g.</u>, <u>In re Tsurukawa</u>, 287 B.R. 515, 521 (B.A.P.

9th Cir. 2002) ("[E]ach partner acts as principal for himself or herself and as agent for the copartners in the transaction of partnership business.").

Here, Michael Quackenbush, the MKA partner who performed the Royalty Audit, signed PNY's NDA on behalf of MKA in California.  See Quackenbush Decl. in Supp. of Def.'s Mot. to Transfer, at ¶ 9, D.E. 11-2.  Michael Quackenbush also added "handwritten interlineations," that the NDA and its terms are to be governed by California's laws.  See id.  One of PNY's main allegations is that MKA violated the NDA.  See Notice of Removal, at ¶ 1, D.E. 1; see also Pl.'s Opp'n Br., at 4, D.E. 18.  Thus, through Michael Quackenbush's conduct and through MKA's Royalty Audit for SanDisk:  (i) MKA has "purposely directed" its activities at California; (ii) PNY's claim that MKA breached the NDA "relate to" MKA's supposed disclosures to SanDisk in California; and (iii) California's jurisdiction over MKA is reasonable considering MKA's business there.  See Marten, 499 F.3d at 296.  Therefore, MKA meets its burden of demonstrating that this action could have been brought in California, as it has shown that personal jurisdiction exists over MKA in California.

### ii.  Venue

28 U.S.C. § 1391 governs venue for all civil actions.  Specifically, under Section 1391(b), a civil action may be brought in:

>  (1) a judicial district in which any defendant resides, if all defendants reside in the same State in which the district is located;

>  (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or

>  (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).[6]

A review of the record indicates that venue is proper in the Northern District of California under §§ 1391(b)(1) and (2).  First, partnerships reside in any district in which they are subject to personal jurisdiction for purposes of venue.  See Dellget v. Wolpoff & Abramson, LLP, No. 07-1024, 2007 WL 4142769, at *2 (E.D. Pa. Nov. 17, 2007).  Because the Court has already established that California has personal jurisdiction over MKA, venue is proper under 1391(b)(1).[7]

Second, venue in the Northern District of California is proper under § 1391(b)(2) because the record demonstrates that "a substantial part of the events or omissions giving rise to the claim" occurred in California.  The Third Circuit has emphasized that events or omissions supporting a claim must be "substantial," and that events or omissions with only "some tangential connection with the dispute in litigation are not enough."  Cottman Trans. Sys., Inc., v. Martino, 26 F.3d 291, 294 (3d Cir. 1994).  To assess "whether events or omissions giving rise to the claims are substantial, it is necessary to look at the nature of the dispute."  Id. at 295.  In its

---

[6] For purposes of venue under 28 U.S.C. § 1391(b)(1), the residency analysis for a partnership does not involve the residences of the individual partners.  Instead, the analysis is identical to the residency analysis for a corporation.  See Dellget v. Wolpoff & Abramson, LLP, No. 07-1024, 2007 WL 4142769, at *2 (E.D. Pa. Nov. 17, 2007); see also Graf v. Tastemaker, 907 F. Supp. 1473, 1474 (D. Colo. Dec. 15, 1995) (applying venue standards for corporations to a partnership); Kingsepp v. Wesleyan Univ., 763 F. Supp. 22, 28 (S.D.N.Y. 1991) (explaining that 28 U.S.C. § 1391(c) is interpreted to include not just corporations but also trusts, voluntary associations, and partnerships).  A corporation is considered to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.  See Aventis Pharma S.A. v. Sandoz Inc., No. 06-3671, 2007 WL 1101228, at *2 (D.N.J. Apr. 10, 2007) (citing 28 U.S.C. § 1391(c)).  Thus, there is venue in the district where the court may exercise personal jurisdiction over a partnership.

[7] In its opposition to the motion, PNY concedes that it may have brought its claims against MKA in the Northern District of California because MKA "resides in that judicial district."  See Pl.'s Opp. Br., at 5, D.E. 18.

Complaint, PNY describes the nature of this action by stating that MKA "performed an audit pursuant to" the License Agreement and that "[u]nder the License Agreement, [MKA] was required to be independent of SanDisk." See Compl., Ex. A to Notice of Removal, at ¶ 1, D.E. 1.  PNY further asserts that MKA "concealed its connections with SanDisk, engaged in constant and secret communications with SanDisk and its outside counsel during the course of the audit, disclosed confidential PNY information to SanDisk" and "produced an audit report so biased and flawed." See id.  Thus, in its own description of the nature of the claims, PNY acknowledges that the main events or omissions leading to its claims arose from MKA's alleged misconduct with SanDisk, which occurred in California.  For instance, MKA could only have "disclosed confidential PNY information to SanDisk" in California, as that is where MKA prepared and distributed its reports.  See id. at ¶ 18.  Therefore, this factor favors venue in California.

Section 1391(b)(3) does not apply here because there is venue where the claim could be brought, namely California.  As such, MKA has met its burden of showing that venue appropriately lies in California and thus has established that this action could have been brought in California.

The Court must next evaluate whether the transfer is in the interest of justice and "must consider both the private and public interests affected by the transfer."  See Jumara, 55 F.3d at 879.  Because this Court already established that a balance of the public factors weighs in favor of transferring the case to California, the Court will next determine whether private factors affect transfer.

### 2.  Private Factors

#### i.  Plaintiff's Choice of Forum/Defendant's Preference

Ordinarily, the plaintiff's choice of forum is a "paramount consideration" in any

determination of a transfer request, and should not be "lightly disturbed."  See Aventis Pharma S.A. v. Sandoz Inc., No. 06-3671, 2007 WL 1101228, at *3 (D.N.J. Apr. 10, 2007) (citing APV N.A., Inc., v. Sig Simonazzi N.A., Inc., 295 F. Supp. 2d 393, 398 (D. Del. Apr. 30, 2002).  Plaintiff's choice will prevail "unless the party moving for the transfer can convince the court that its alternative forum is not only adequate, but more convenient than the present forum."  Celgene Corp. v. Abrika Pharm., Inc., No. 06-5818, 2007 WL 1456156, at *4 (D.N.J. May 17, 2007).  However, "[w]hen the central facts of a lawsuit occur outside of the chosen forum, plaintiff's choice of forum is accorded less weight."  Wallace v. Mercantile Cnty. Bank, No. 06-3974, 2006 WL 3302490, at *5 (E.D. Pa. Nov. 9, 2006).  Moreover, a "permissive forum selection clause is a factor considered in § 1404(a) motions," Cancer Genetics, Inc. v. Kreatech Biotechnology, B.V., No. 07-273, 2007 WL 4365328, at *4 (D.N.J. Dec. 11, 2007), as it manifests the parties' "preferences as to a convenient forum . . . [and] is entitled to substantial deference."  Jumara, 55 F.3d at 880.

Here, PNY's principal place of business is in New Jersey.  See Notice of Removal, ¶ 3, D.E. 1.  Therefore, this factor, which is of "paramount consideration," disfavors transfer.  Aventis, 2007 WL 1101228, at *3.  However, the crucial facts of the case occurred in California.  For example, SanDisk contacted and hired MKA in San Francisco to perform the License Agreement's audit, which gave rise to MKA's relationship with PNY.  See Quackenbush Decl. in Supp. of Def.'s Mot. to Transfer, at ¶ 7, D.E. 11-2.  Further, MKA issued its final report from its San Francisco office.  See id. at ¶ 14.  As a result, PNY's choice of forum is accorded less weight.  Moreover, as MKA, which has no offices or employees in New Jersey, seeks to transfer this action to the Northern District of California, this factor favors transfer.  See Def.'s Mot. to Transfer, at 30, D.E. 11-1.

### ii.  Where the Claims Arose

MKA argues that PNY's claims against it arose out of events occurring in California, and not in New Jersey.  See Def.'s Mot. to Transfer, at 29, D.E. 11.  For example, MKA asserts that PNY's claims concerning MKA's alleged defective and biased audit arose out of California, as that is where MKA performed the audit and released the disputed information.  See id. at 26, 30. Further, MKA asserts that its purported sharing of PNY's financial information with SanDisk and its outside counsel in violation of the NDA, could only have occurred in California because that is where the MKA and SanDisk personnel working on the audit work and reside.  See id.; see also Decl. of Stephen J. Tully ("Tully Decl.") in Supp. of Def.'s Mot. to Transfer, at ¶ 10, D.E. 11-3; Quackenbush Decl. in Supp. of Def.'s Mot. to Transfer, at ¶ 10, D.E. 11-2.

In response, PNY argues that both New Jersey and California have ties to the relevant facts in this case.  See Pl.'s Opp'n Br., at 9, D.E. 18.  For instance, PNY provides that MKA "twice traveled to New Jersey for purposes of conducting the audit," and thus "a substantial portion" of the audit occurred at "PNY's headquarters in New Jersey."  See id.  PNY further states that during these trips, two MKA representatives spent a week in PNY's offices gathering information to complete the audit.  See id. at 10; see also Decl. of Toni D'Alessandro ("D'Alessandro Decl.") in Supp. of Pl.'s Opp'n Br., at ¶¶ 6-8, D.E. 18-3.  In addition, PNY asserts that several of its employees gathered information for MKA's reports, and participated in phone calls with MKA in New Jersey.  See Ciano Decl. in Supp. of Pl.'s Opp'n Br., at ¶¶ 6-8, D.E. 18-2.  Thus, PNY contends that this factor weighs against transfer.  See Pl.'s Opp'n Br., at 10, D.E. 18.

However, the fact that those MKA representatives twice traveled to New Jersey and spent a week there during an audit that lasted several months, does not change the fact that a

substantial amount of the acts underlying the litigation occurred in California, where the report was prepared and disseminated.  For example, in <u>Leone v. Cataldo</u>, the court noted that a defendant's "single visit" to a forum "may provide the necessary minimum contacts with the forum."  574 F. Supp. 2d 471, 479 (E.D. Pa. Aug. 11, 2008).  However, in that case, the court reasoned that a single visit was only sufficient because the "contract that forms the basis of the suit was negotiated during that visit."  <u>Id.</u>  Unlike <u>Leone</u>, MKA's visits to PNY's New Jersey office were simply to "compile records" for the Royalty Audit, and were part of the firm's overall "field work for its California client."  <u>See</u> Quackenbush Decl. in Supp. of Def.'s Mot. to Transfer, at ¶ 11, D.E. 11-2; Def.'s Mot. to Transfer, at 23, D.E. 11.  MKA's two visits did not result in any substantial agreement with PNY that "forms the basis of the suit."  <u>See Leone</u>, 574 F. Supp. 2d at 429.  Instead, MKA analyzed, calculated, and finalized the Royalty Audit in California, in compliance with the California State Board of Accountancy.  <u>See</u> Quackenbush Decl. in Supp. of Def.'s Mot. to Transfer, at ¶¶ 11-14, D.E. 11-2; <u>see also</u> NDA, Ex. 8 to Def.'s Mot. to Transfer, D.E. 11.  After analyzing the nature and basis of PNY's Complaint, the Court concludes that the locus of the alleged culpable conduct relating to the claims occurred in California.  This factor, therefore, weighs in favor of transfer.

### iii.  Convenience of the Parties/Relative Physical and Financial Conditions of the Parties

MKA argues that the Court should consider MKA's "relatively small partnership," consisting of "only 22 partners," and how it has significantly less means than PNY, which is a "multi-national corporation with numerous offices throughout the United States."  <u>See</u> Def.'s Mot. to Transfer, at 30-31, D.E. 11.  In addition, MKA points out that PNY has already retained counsel from San Francisco and litigated in California for related actions involving PNY and SanDisk.  <u>See id.</u> at 31.  In those related cases, PNY's attorneys already deposed several of

MKA's representatives and subpoenaed MKA's audit records.  See Quackenbush Decl., Ex. C to Notice of Removal, D.E. 1.  Thus, MKA argues that California would be more convenient for the parties.

On the other hand, PNY asserts that this factor is neutral because "it is no more inconvenient for [MKA] to litigate in New Jersey than it would be for PNY to litigate in California."  See Pl.'s Opp'n Br., at 11, D.E. 18.  However, PNY also argues that this factor weighs against transfer, as the fact that MKA has "less means" than PNY, and the fact that PNY litigated in California has no bearing.  See id. at 12.

This is not a case where transferring merely switches the inconvenience from defendant to plaintiff.  See, e.g., Market Transition Facility of N.J. v. Twena, 941 F. Supp. 462, 367, 467 (D.N.J. Oct. 7, 1996) ("A court will not grant a transfer simply because the transferee court is more convenient for the defendants . . . If the transfer would merely switch the inconvenience from defendant to plaintiff, the transfer should not be allowed.").  Instead, because PNY has already litigated in California for related actions arising from the same License Agreement, this factor weighs in favor of transfer.

### iv.  Convenience of the Witnesses

The Court's primary concern in balancing this factor is the convenience of non-party witnesses.  See In re Consolidated Parlodel Litig., 22 F. Supp. 2d 320, 324 (D.N.J. July 27, 1998).  In this case, MKA asserts that all its non-party witnesses are located in California, making California the more convenient forum.  See Def.'s Mot. to Transfer, at 31-32, D.E. 11.  For example, MKA identifies SanDisk representatives as some of the currently known potential non-party witnesses.  See id. at 32.  MKA argues that all of these SanDisk representatives who allegedly received PNY's confidential information from MKA, reside in the Northern District of

California.  See id.; see also Tully Decl. in Supp. of Def.'s Mot. to Transfer, at ¶ 10, D.E. 11-3.

On the other hand, PNY argues that all of its non-party witnesses, namely former PNY

employees, are located in New Jersey.  See Pl.'s Opp'n Br., at 8, D.E. 18.  Thus, PNY argues

that the presence of non-party witnesses in New Jersey militates against transfer.  See id.

Although it may be more convenient for MKA to proceed with this action in California,

that convenience is equal to the convenience for PNY to maintain this action in New Jersey.

Indeed, the record reflects that many of MKA's non-party witnesses are located in California, see

Tully Decl. in Supp. of Def.'s Mot. to Transfer, at ¶10, D.E. 11-3, and that many of PNY's non-

party witnesses are in New Jersey, see D'Alessandro Decl. in Supp. of Pl.'s Opp'n Br., at ¶ 5,

D.E. 18-3.  Thus, witnesses are located in both forums, and regardless of whether this action

proceeds in New Jersey or California, traveling across the country will inevitably inconvenience

some witnesses.  Therefore, this factor is neutral in the Court's analysis.

### v.  Location of Records

The location of books and records is a neutral factor as there is no indication that records

could not be produced in either district.  See Mercedes-Benz USA, LLC v. ATX Group, Inc., No.

08-3529, 2009 WL 2255727, at *4 (D.N.J. July 27, 2009) ("The location of the disputed records

is also neutral since there is nothing to suggest that the records, which are admittedly in

electronic form, cannot be easily transmitted.").

### vi.  Balance of Conveniences

Based upon the record, MKA has met its burden of persuasion.  Although PNY's choice

of forum is entitled to considerable deference, the balance of the Jumara factors weigh strongly

in favor of transfer.  Here, the Northern District of California is "not only adequate, but more

convenient than" New Jersey.  See Celgene, 2007 WL 1456156, at *4.  For these reasons, the

private interest factors weigh in favor of transfer to the Northern District of California.

**V.      Conclusion**

For the foregoing reasons, Defendant's motion to transfer [D.E. 11] this action to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a) is granted.  The Court denies as moot Defendant's motion to dismiss for forum non conveniens.

An appropriate Order accompanies this Opinion.

*s/ Michael A. Hammer*
**United States Magistrate Judge**

Dated:  March 24, 2015