1
2
3
4                    IN THE UNITED STATES DISTRICT COURT

5                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    PNY TECHNOLOGIES, INC.,                    Case No.  15-cv-01728-MMC

8                    Plaintiff,
                                                **ORDER DENYING PLAINTIFF'S**
9          v.                                   **MOTION FOR NEW TRIAL**

10   MILLER, KAPLAN, ARASE & CO., LLP,

11                   Defendant.

12

13         Before the Court is plaintiff PNY Technologies, Inc.'s ("PNY") "Motion for a New

14   Trial," filed December 14, 2016.  Defendant Miller, Kaplan, Arase & Co., LLP ("Miller

15   Kaplan") has filed opposition, to which PNY has replied.  Having read and considered the

16   papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

17                                  **BACKGROUND**

18         In 2008, PNY, a "seller of USB and SD flash memory system products" (see

19   Compl. ¶ 6), entered into a license agreement with SanDisk Corporation ("SanDisk"),

20   under which agreement SanDisk had the right "to have an independent Third Party

21   accounting firm" audit PNY's compliance with the terms of the license agreement (see

22   Tully Decl., filed July 22, 2016, Ex. 55 § 5.11).[2]

23         On May 30, 2014, PNY instituted the above-titled action by filing a complaint

24   against Miller Kaplan, alleging claims arising from its assertion that Miller Kaplan, which

25   had been engaged by SanDisk in 2010 to audit PNY's compliance with the license

26   _____

27         [1]By order filed February 27, 2017, the Court took the matter under submission.

28         [2]The license agreement was admitted at trial as Exhibit 7.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  agreement, had engaged in misconduct in connection with the audit.  In its complaint,

2  PNY alleges five Counts, titled, respectively, "Breach of Contract - Non-Disclosure

3  Agreement," "Fraud," "Intentional Misrepresentation," "Negligent Misrepresentation," and

4  "Tortious Interference with Contract."

5  　　　By order filed September 28, 2016, the Court granted in part Miller Kaplan' motion

6  for summary judgment.  Specifically, the Court granted summary judgment in favor of

7  Miller Kaplan as to the fraud/misrepresentation claims to the extent those claims were

8  based on the theory that Miller Kaplan had made false statements in its audit reports, and

9  as to the claim alleging tortious interference with contract.  The Court denied Miller

10  Kaplan's motion for summary judgment as to the remaining claims, specifically, the

11  fraud/misrepresentation claims to the extent those claims were based on the theory that

12  Miller Kaplan had falsely represented it was independent of SanDisk, and as to the

13  breach of contract claim.

14  　　　A jury trial on the remaining claims began on October 31, 2016.  After the close of

15  evidence, the Court granted Miller Kaplan's motion for judgment, pursuant to Rule 50 of

16  the Federal Rules of Civil Procedure, as to the breach of contract claim.  (See Trial Tr.

17  vol. 8, 1581:15-16, 1603:15-20.)  The remaining fraud/misrepresentation claims were

18  submitted to the jury, which, on November 15, 2016, found that (a) "Miller Kaplan [made]

19  a false representation to PNY regarding independence," (b) Miller Kaplan either "[knew]

20  that the representation was false" or "[made] the representation recklessly or without

21  regard for its truth," (c) "Miller Kaplan intend[ed] that PNY rely on the misrepresentation,"

22  (d) "PNY reasonably rel[ied] on the representation," but (e) "PNY's reliance on Miller

23  Kaplan's representation" was not "a substantial factor in causing harm to PNY."  (See

24  Verdict Form.)

25  　　　On November 16, 2016, the Clerk of Court entered judgment in favor of Miller

26  Kaplan and against PNY.

27  //

28  //

**DISCUSSION**

By the instant motion, PNY seeks, pursuant to Rule 59(a), a new trial on its claims alleging breach of contract and intentional fraud.  PNY argues it is entitled to such relief for the reason that, according to PNY, the Court made various erroneous rulings.

A district court "may grant a new trial only if the verdict is contrary to the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."  See Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation and citation omitted).  Where, as here, a party seeks a new trial due to assertedly erroneous rulings, the plaintiff must establish the asserted errors "affect[ed] the essential fairness of the trial," see McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 553 (1984); stated otherwise, the errors must have "substantially prejudiced" the moving party in its ability to present its case, see United States v. 99.66 Acres of Land, 970 F.2d 651, 658 (9th Cir. 1992).

**A.  Breach of Contract Claim**

PNY's breach of contract claim was based on the theory that, in June and July of 2011, Miller Kaplan, in violation of the terms of a non-disclosure agreement, provided SanDisk with PNY's confidential business records, obtained by Miller Kaplan in connection with the audit, and that PNY was damaged by such alleged disclosures in that, after SanDisk allegedly received the confidential records, PNY lost market share to SanDisk.

To support its theory that it had lost market share to SanDisk, PNY sought to introduce testimony from Gadi Cohen ("Cohen"), PNY's Chief Executive Officer.  PNY proposed that Cohen would testify that, in 2011, PNY suffered a loss of market share and that he would rely on material published by a third party, "NPD," to establish a causal link between PNY's loss of market share and the above-referenced alleged disclosures by Miller Kaplan to SanDisk.  (See Pl.'s Opp. to [Def.'s] Objection, filed October 31, 2016, at

//

//

3

United States District Court
Northern District of California

1:9-12, 3:14-17.)[3]  More specifically, PNY sought to offer through Cohen five exhibits that were "market share trial demonstratives" PNY had "created from public market share research . . . available to anyone with [a] subscription to the market-based research group NPD."  (See Pl.'s Opp. to [Def.'s] Objection, filed October 31, 2016, at 1:9-12.)

Miller Kaplan objected to admission of the five demonstrative exhibits, as well as to any testimony regarding their content, on several grounds, including hearsay.  The Court sustained the objection, finding the contents of the demonstratives to be inadmissible hearsay.  (See Trial Tr. vol. 3 at 610:1 - 613:19.)  PNY thereafter failed to offer other evidence to support its claim that it was damaged by the alleged breach of the non-disclosure agreement.  At the close of evidence, Miller Kaplan moved for judgment on the claim, on the ground that PNY had not offered any evidence of damage.  The Court, as noted above, granted Miller Kaplan's motion, and the breach of contract claim was not presented to the jury.

In the instant motion, PNY argues it is entitled to a new trial on its breach of contract claim, for the asserted reason that the Court, when it excluded the five demonstrative exhibits and testimony based thereon, did not comply with the requirements set forth in R & R Sails, Inc. v. Insurance Co., 673 F.3d 1240 (9th Cir. 2012).  The Court disagrees, as the requirements in R & R Sails are inapplicable given the basis for the order of exclusion challenged here.

In R & R Sails, the Ninth Circuit held that where imposition of a discovery sanction imposed under Rule 37(c)(1) would "amount[ ] to dismissal of a claim," the district court must consider "whether the claimed noncompliance involved willfulness, fault, or bad faith" and "the availability of lesser sanctions."  See id. at 1247.  Here, however, the Court did not exclude the demonstratives and testimony based thereon as a discovery sanction,

---

[3]According to PNY, NPD is a "subscription-based market research service that allows anyone to access market share information compiled from publicly-available sources."  (See id. at 1:25-26.)  Cohen testified at his deposition that he understood NPD's sources to be "all the retailers."  (See Robertson Decl., filed December 14, 2016, Ex. 6 at 322:12-15.)

4

1  but, rather because such evidence constituted inadmissible hearsay.[4]  As PNY does not

2  contend the Court erred in finding the subject evidence to be inadmissible hearsay, PNY

3  fails to identify any basis for a new trial on its breach of contract claim.

4         Accordingly, to the extent PNY seeks a new trial on its claim alleging breach of

5  contract, the motion will be denied.

6  **B.  Intentional Misrepresentation Claim**

7         PNY's intentional misrepresentation claim was based on the theory that Miller

8  Kaplan falsely represented to PNY that Miller Kaplan was independent of SanDisk, and

9  that, prior to the audit, had PNY known of such lack of independence, it would have

10  requested that SanDisk retain a different auditor.  With respect to injury, PNY's theories

11  were that Miller Kaplan issued a flawed audit report that was a substantial factor in

12  causing SanDisk to file a lawsuit against PNY for breach of the license agreement and to

13  cease negotiations with PNY as to the terms of a possible agreement to sell SanDisk

14  products to PNY.  As noted, the jury found Miller Kaplan made a false representation to

15  PNY regarding independence, and that, although PNY reasonably relied thereon, PNY's

16  reliance was not a substantial factor in causing the injuries claimed by PNY.

17         PNY argues that it is entitled to a new trial as to both of its theories of injury.  As

18  discussed below, the Court disagrees.

19         **1.  SanDisk's Filing of Lawsuit Against PNY**

20         As noted, PNY asserted that Miller Kaplan's issuance of the audit report was a

21  substantial factor in causing SanDisk to file against PNY a lawsuit alleging breach of the

22  license agreement.

23         At trial, in support of its argument that PNY could not show a causal connection

24  between the audit report and SanDisk's decision to file its lawsuit against PNY, Miller

25

26         ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[4]Although Miller Kaplan did seek exclusion of the demonstrative exhibits and
27  testimony as a sanction under Rule 37(c)(1) for failure to timely disclose the information
contained in those exhibits, the Court never ruled on that request, in light of its finding
28  excluding the evidence on other grounds.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Kaplan offered the testimony of Jim Brelsford ("Brelsford"), SanDisk's chief legal officer at

2    the time SanDisk decided to file its lawsuit against PNY.  Brelsford testified PNY's "failure

3    to provide information over the course of an extended period of time" led him to

4    "believe[ ] that [PNY] [was] not operating in good faith" (see Brelsford Dep. (Tully Decl.,

5    filed July 22, 2016, Ex. A) at 289:11-18),[5] a perception that "existed independent and

6    irrespective of whatever dollar estimates may have been included in any Miller Kaplan

7    audit" (see id. at 290:7-14).  Brelsford further testified that SanDisk and PNY had a legal

8    dispute over the meaning of the license agreement, specifically, a dispute as to what

9    products were covered thereunder, and that PNY had refused to mediate the dispute.

10   (See id. at 319.)  When asked whether the "difference of opinion between SanDisk and

11   PNY about what was covered and not covered and the need for a legal resolution

12   through a lawsuit existed independent of and irrespective of any Miller Kaplan audit

13   report," Brelsford answered, "[y]eah, I would say so."  (See id. at 319:22 - 320:4.)

14        After Miller Kaplan rested its case, PNY sought to offer testimony from Cohen, its

15   CEO, in rebuttal to Brelsford's testimony.  Specifically, PNY, after noting that Brelsford

16   had testified he understood a mediation provision in the license agreement to be

17   mandatory in nature, proposed that Cohen would testify he interpreted the provision as

18   not being mandatory when an audit was "underway."  (See Trial Tr. vol. 8 at 1568:13-19,

19   1569:9 - 1570:6.)[6]  Miller Kaplan objected to the introduction of the proposed testimony,

20   and the Court sustained the objection, on the ground Cohen came to such interpretation

21   long after the time at which SanDisk proposed mediation, and that neither he nor anyone

22   _____

23        [5]Brelsford's videotaped deposition testimony was played for the jury.

24        [6]The provision, in relevant part, states:  "All disputes arising directly under the
     express terms of this [a]greement will be resolved as follows:  First, the senior
25   management of both parties will engage in good faith negotiations for up to thirty days in
     an attempt to resolve such disputes.  If the disputes cannot be resolved by senior
26   management within the thirty day good faith negotiation period, the parties will engage in
     a full-day (8 hours) mediation, with authorized senior executives of each [p]arty present
27   for the duration of the mediation.  Should the mediation fail to result in an agreement-in-
     principle, either party may initiate litigation proceedings in the Northern District of
28   California."  (See Tully Decl., filed July 22, 2016, Ex. 55 § 7.9(d).)

else at PNY had ever communicated such interpretation to SanDisk.  (See Trial Tr. vol. 8 at 1571:5 - 1577:16.)

PNY argues the Court erred in not allowing Cohen to testify in rebuttal as to his interpretation of the mediation provision.  PNY, however, does not dispute that, at the time it sought to offer Cohen in rebuttal, it did not offer to prove, nor does it do so by way of the instant motion, that the reason PNY declined to mediate was because PNY had, at that time, interpreted the mediation provision as being permissive in light of the pendency of the audit.  Nor has PNY shown that Cohen's interpretation of the license agreement would have been relevant to any other disputed issue.  In short, PNY has failed to show the order sustaining Miller Kaplan's objection to Cohen's proffered rebuttal testimony was erroneous.

Lastly, in a footnote, PNY observes that Miller Kaplan, in its closing argument, stated that Brelsford had "no axe to grind" and "no motive to do anything but tell the truth" (see Trial Tr. vol. 9 at 1713:1-2, 1714:8), as he "is retired" (see id. at 1713:4) and "doesn't work for SanDisk anymore," and thus "has no connection to SanDisk whatsoever" (see id. at 1714:3-5); (see Pl.'s Mot. for New Trial at 19:25-28).  PNY argues the statements were false because Brelsford is not "retired," in that, at the time he gave his testimony, he was working for the law firm of Skadden, Arps, Slate, Meagher & Flom, and, in such capacity, "has worked on SanDisk legal matters."  (See id. at 20:26-28 (citing Robertson Decl., filed December 14, 2016, Ex. 13 (Brelsford Dep.) at 86:21 - 87:2).)  To the extent PNY may be arguing that the assertedly false statements caused a "miscarriage of justice" or otherwise entitle it to a new trial, see Molski, 481 F.3d at 729, the Court disagrees, as PNY fails to show the statements were false or misleading.  Read in context, the reference to Brelsford's being "retired" and having "no connection to SanDisk" was likely intended by counsel for Miller Kaplan and understood by the jury to refer to Brelsford's employment status with SanDisk, i.e., that he was no longer employed at that company, and the jury was free to draw or not draw therefrom the inference suggested by Miller Kaplan.

1    Accordingly, PNY has failed to show it is entitled to a new trial on its theory that

2    Miller Kaplan's issuance of the audit report was a substantial factor in causing SanDisk to

3    file its lawsuit against PNY.

4         **2.  Disruption in Contractual Negotiations**

5    As noted, PNY claimed Miller Kaplan's issuance of the audit report was a

6    substantial factor in causing SanDisk to end negotiations concerning the possibility of

7    entering an agreement under which SanDisk would sell its products to PNY.  As such

8    theory was explained by PNY in a pretrial filing, "while the audit was underway

9    (December 2010 through June 2011)" PNY was "engaged in discussions with SanDisk to

10   purchase flash memory products," and "one month after Miller Kaplan's final royalty audit

11   report came out," SanDisk "cut off communications with PNY."  (See Pl.'s Opp. to Def.'s

12   Mot. in Limine No. 1, filed October 12, 2016, at 11.)

13        **a.  Exclusion of Emails Produced After Close of Fact Discovery**

14   PNY argues the Court erred in excluding certain emails that document

15   negotiations between PNY and SanDisk as to a possible sales agreement.

16   Prior to trial, Miller Kaplan filed a motion in limine by which it sought to preclude

17   PNY from offering evidence to support an "unpleaded theory," specifically, that "PNY and

18   SanDisk might have engaged in a sales relationship . . . but for Miller Kaplan's

19   supposedly false royalty audit."  (See Def.'s Mot. in Limine No. 7, filed October 3, 2016,

20   at 3:1-3, 17-20.)[7]  In particular, Miller Kaplan sought to preclude PNY from offering emails

21   between PNY and SanDisk employees regarding a potential sales agreement, for the

22   reason that the emails were not disclosed to Miller Kaplan until August 1, 2016, a date

23   well after the May 16, 2016, deadline for completion of fact discovery.  (See Pretrial

24   Preparation Order, filed September 28, 2015.)  In its opposition, PNY argued it had given

25   adequate notice of such theory during discovery, but did not address the circumstances

26

27        _____

          [7]In its complaint, PNY alleged only in general terms that "[a]s a result of Miller
28   Kaplan's fraud, PNY has suffered and/or will suffer damages."  (See Compl. ¶ 48.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1  or timing of its disclosure of the emails Miller Kaplan sought to exclude.  After hearing

2  oral argument on Miller Kaplan's motion, the Court afforded the parties an opportunity to

3  file additional declarations to support their respective positions, and both parties

4  subsequently did so.

5       Thereafter, on October 19, 2016, the Court issued an order in which it granted in

6  part and denied in part Miller Kaplan's motion.  To the extent the motion sought to

7  exclude all evidence offered to show PNY lost a "possible sales contract" with SanDisk,

8  the Court denied the motion, finding PNY had adequately disclosed such theory in its

9  timely responses to Miller's Kaplan's interrogatories.  (See Order Re: Def.'s Mot. in

10  Limine No. 7, filed October 19, 2016, at 1:13-16.)  To the extent the motion sought to

11  exclude "the email exchanges between SanDisk and [PNY] reflecting those [sales]

12  discussions," however, the Court granted the motion, finding exclusion was proper under

13  Rule 37(c)(1), as production of that evidence was required under Rule 26(a) and PNY

14  had failed to show substantial justification for its late production or a lack of prejudice to

15  Miller Kaplan.  (See id. at 1:17-23.)

16       As noted, PNY argues the Court erred in excluding the subject emails.  Under

17  Rule 37(c)(1), "[i]f a party fails to provide information . . . as required by Rule 26(a) . . .,

18  the party is not allowed to use that information . . . at a trial, unless the failure was

19  substantially justified or is harmless."  See Fed. R. Civ. P. 37(c)(1).  PNY does not

20  contend the Court erred in finding PNY was required by Rule 26(a) to disclose the emails,

21  nor does it contend PNY's disclosure was timely or that PNY had a substantial

22  justification for the late disclosure.  Rather, PNY argues, Miller Kaplan was not prejudiced

23  by the late disclosure of the emails.

24       The timely disclosure PNY did make with respect to its theory that it lost the

25  opportunity to enter into a sales agreement with SanDisk, which disclosure was set forth

26  in a response to an interrogatory, stated in full as follows:

27       SanDisk is one of only a handful of companies in the world that
        manufacture the raw material (NAND flash) that is used to make the chips
28       that go inside the finished products that PNY sells.  PNY purchases NAND

flash directly from these companies in order to manufacture finished products such as flash drives and SD cards, among others.  (PNY also purchases partially or fully assembled products for resale.)  Since [Miller Kaplan's] [a]udit and ensuing SanDisk [l]itigation, PNY has not had any business relationship with SanDisk.  This means that PNY has access to one less supplier in what is already an extremely limited market for raw materials.  SanDisk's competitors know that PNY does not deal with SanDisk, which puts PNY at a disadvantage when negotiating with SanDisk when it comes to PNY.  PNY has lost millions of dollars in profits as a result.

Additionally, if [Miller Kaplan's] [a]udit had not destroyed the relationship between PNY and SanDisk, PNY could have turned SanDisk into one of its major suppliers -- not only of raw materials, but also downstream products and components that SanDisk sells.  If PNY had continued to do business with SanDisk, PNY would have earned millions of dollars in additional profits.

(See Robertson Decl., filed December 14, 2016, Ex. 1 at 22:1-4.)

The above-quoted disclosure did not state that PNY and SanDisk had reached or were about to reach an agreement under which SanDisk would sell products to PNY. Nor does PNY contend that it otherwise gave Miller Kaplan, while fact discovery was open, notice that any negotiations between SanDisk and PNY had occurred.  As a result, during fact discovery, Miller Kaplan was unaware of any such negotiations, let alone their having occurred around the time Miller Kaplan issued its final audit report in mid-June 2011.  (See Tully Decl., filed July 22, 2016, Ex. 9.)  By contrast, the emails that were later disclosed indicated that, on July 1, 2011, Joanna Wong ("Wong"), a SanDisk employee, emailed to Jacob Afber ("Afber"), PNY's Vice President of Procurement, a proposed "Contract," and that, on July 14, 2011, Afber responded with a "draft with our comments," and stated, "[p]lease review and let us know when you will be ready to discuss" (see Afber Decl., filed August 5, 2016, Ex. H), after which, on July 15, 2011, Wong stated to Afber that "last week" she was "informed by Executive management" to "put the process on hold."  (See id.)[8]

---

[8]The emails also indicated that between January 21, 2010 and June 13, 2011, Afber and Arie Tal ("Tal"), a SanDisk employee, discussed the possibility of SanDisk's selling various products to PNY, without reaching any agreement to do so.  (See id. Exs. B-G.)

1    PNY argues that Miller Kaplan was not prejudiced by the untimely disclosure of the

2    emails because, PNY contends, Miller Kaplan had "ample opportunity" after the

3    disclosure to take "additional testimony," such as deposing Wong and Tal, the above-

4    referenced SanDisk employees who had authored the subject emails sent to PNY.  (See

5    Pl.'s Mot. for New Trial at 12:14-19.)  PNY also argues that Miller Kaplan deposed Afber

6    after it had obtained the emails, and, consequently, the late disclosure was harmless.

7    The Court is not persuaded.

8        A scheduling order "is not a frivolous piece of paper, idly entered."  See Johnson

9    v. Mammoth Recreations, Inc., 975 F.2d 604, 610 (9th Cir. 1992) (internal quotation and

10    citation omitted); see also Wong v. Regents of the University of California, 410 F.3d

11    1052, 1062 (9th Cir. 2005) (holding scheduling orders "permit the court and the parties to

12    deal with cases in a thorough and orderly manner").  Consequently, Miller Kaplan could

13    not simply have taken whatever discovery it wanted after it received PNY's untimely

14    disclosure; it would have been required to move to reopen fact discovery, given that the

15    deadline set by the Court had already passed.  Moreover, at a time when Miller Kaplan

16    would have turned its attention to other important aspects of trial preparation, it would

17    have had to schedule and conduct a number of depositions and other discovery

18    pertaining to the late-disclosed emails, thereby putting it at a disadvantage and disrupting

19    the schedule previously adopted by the Court after careful consideration.

20        In that regard, although, as PNY points out, Afber was deposed after the late

21    disclosure,[9] Miller Kaplan would have needed to depose the above two SanDisk

22    employees, as well as Mark Ciano ("Ciano"), PNY's President, and Heidi Stuto ("Stuto"),

23    PNY's Treasurer, each of whom was involved in the negotiations as reflected in the

24

25        [9]Afber was deposed on October 14, 2016 (see Robertson Decl., filed December
26    14, 2016, Ex. 7), just two weeks before trial.  The parties did not seek leave of court to
     depose Afber on such untimely basis and the record does not indicate the reason(s) PNY
27    seemingly delayed producing Afber for deposition.  (See, e.g., Tully Decl., filed October
     3, 2016, ¶ 12 (counsel for Miller Kaplan's statement that, as of October 3, 2016, PNY had
28    yet to provide dates to depose Afber).)

United States District Court
Northern District of California

United States District Court
Northern District of California

1   emails, and likewise would have had information relevant to a claim based in part

2   thereon.[10]  Deposing all of those additional potential witnesses would have been

3   particularly important to Miller Kaplan, as the emails included comments that suggested

4   PNY and SanDisk would have had considerable difficulty in ever reaching an

5   agreement.[11]

6           PNY's argument that its late production of Afber for deposition eliminated any

7   prejudice likewise is unavailing.  Although Afber did receive emails from SanDisk and

8   sent several in response, Afber's deposition testimony made clear that he was not in a

9   position to meaningfully offer testimony relevant to the key legal issue presented, whether

10  it was "reasonably probable that the prospective economic advantage would have been

11  realized but for the defendant's interference."  See Westside Center Associates v.

12  Safeway Stores 23, Inc., 42 Cal. App. 4th 507, 522 (1996) (internal quotation and citation

13  omitted).  Specifically, at his deposition, Afber testified that "in this case [he] was just the

14  messenger" who "forward[ed]" a proposed agreement to SanDisk that "was done by

15  [PNY's] lawyers" (see Robertson Decl., filed December 14, 2016, Ex. 7 at 124:20 -

16  125:3), and, when asked if he was "familiar with any of the[ ] changes" to the proposed

17  contract he forwarded to SanDisk, he answered "no" (see id. Ex. 7 at 132:10-14).[12]

18          PNY argues, again citing R & R Sails, that even if a sanction was warranted, the

19  _____

20          [10]Although Miller Kaplan did depose both Ciano and Stuto during fact discovery,
    Miller Kaplan was unaware of the existence of the emails at the time, and, consequently,
21  had no opportunity to question either of them about the emails or the negotiations
    described therein.

22          [11]In response to the Court's ruling that PNY had laid a sufficient factual basis to
23  allow PNY to call an expert witness to offer an opinion as to PNY's claimed damages
    caused by the asserted disruption in negotiations, counsel for Miller Kaplan stated: "[T]his
24  puts me in a horrible position.  I have emails that rebut now what [Cohen] said . . . .  And
    that Heidi Stuto writes an e-mail saying, 'This is all one-sided, we can't do this' . . . ."
25  (See Trial Tr. vol. 7 at 1416:22-25.)

26          [12]At trial, Afber confirmed his limited involvement in the negotiations, testifying that
    "during 2010, [the] Legal Department from both sides was working to put a contract in
27  place" (see Trial Tr. vol. 6 at 1245:1-2), and, when asked if he was "personally involved in
    negotiating with SanDisk related to the agreement," responding "no."  (See id. at
28  1245:15-19.)

United States District Court
Northern District of California

1  instant sanction amounted to dismissal of a claim and the Court erred by not considering

2  "whether the claimed noncompliance involved willfulness, fault, or bad faith" and "the

3  availability of lesser sanctions."  See R & R Sails, 673 F.3d at 1247.  The sanction,

4  however, did not result in the dismissal of a claim, as PNY offered other evidence to

5  support the claim and the matter was submitted to the jury.  Cf. id. at 1242 (reviewing

6  propriety of order excluding as discovery sanction sole evidence plaintiff sought to offer to

7  support claim and of subsequent order granting judgment as matter of law to defendant in

8  light of plaintiff's lacking any admissible evidence to support claim).  As the Ninth Circuit

9  has held, even if a discovery sanction is "onerous," i.e., the sanction makes it "much

10  more difficult, perhaps almost impossible," for the sanctioned party to establish the claim

11  at issue, a district court is not required to "identify willfulness, fault, or bad faith" where, as

12  here, the sanction is "less than a dismissal."  See Yeti by Molly, Ltd. v. Deckers Outdoor

13  Corp., 259 F.3d 1101, 1106 (9th Cir. 2001) (internal quotation and citation omitted).

14       Accordingly, PNY having failed to show its untimely disclosure was harmless, PNY

15  has failed to show the Court erred in excluding such evidence.

16       **b.  Possible Recall of Afber**

17       PNY argues "[t]he Court's refusal to allow PNY to re-call [sic] . . . Afber was

18  erroneous."  (See Pl.'s Mot. for New Trial at 16:2.)  As discussed below, however, PNY

19  never sought leave to recall Afber, and, consequently, cannot show any such error was

20  made.

21       On the sixth day of trial, PNY called Afber in its case-in-chief.  After cross-

22  examination was completed, PNY indicated it had no questions on redirect, and the Court

23  excused Afber.  (See Trial Tr. vol. 6 at 1254:1-4.)  PNY next stated it would call Christian

24  Tregillis ("Tregillis"), an expert witness, and Miller Kaplan requested a hearing outside the

25  presence of the jury, which request was granted, and the matter was addressed in that

26  manner.  (See id. at 1254:7-23.)  During the course of those proceedings, in response to

27  a question by the Court, Miller Kaplan indicated it would not call Afber in the defense

28  case, after which the Court stated "he's welcome to stay."  (See id. at 1254:25 -

13

United States District Court
Northern District of California

1255:3.)[13]  PNY expressed no concern as to Afber's presence, and he thereafter
remained in the courtroom.

Miller Kaplan then argued that the testimony given by Afber was insufficient to lay
a sufficient factual foundation for the "lost profits analysis" as to which Tregillis was
expected to opine, and PNY argued Afber's testimony was sufficient.  (See Trial Tr. vol. 6
at 1255:5 - 1261:19.)[14]  After the Court indicated it did not have the same recollection of
Afber's testimony as recounted by PNY, the Court noted two possible ways to resolve the
matter, specifically, PNY could "put [Afber] back on to clarify whatever he did" or the
Court could "have the reporter read back the testimony that he did give."  (See Trial Tr.
vol. 6 at 1262:16-20.)  PNY stated nothing in response to the Court's suggested
alternatives, whereas Miller Kaplan stated an objection to allowing PNY to recall Afber,
given his having "heard everything [counsel and the Court] just said."  (See id. at 1262:24
-25.)

At that point, the Court, rather than conducting a hearing and ruling on Miller
Kaplan's objection, chose to proceed with what at that time appeared to be an immediate
and equally effective means for determining the substance of Afber's testimony, namely,
having the court reporter read it back.  (See id. at 1263:1-6.)  After the court reporter had
done so, the Court found Afber's testimony was insufficient to lay a factual foundation for
the opinion Tregillis intended to give.  (See id. at 1270:8 - 1271:20.)  PNY then proposed
calling either Cohen or Stuto, and the Court responded that PNY could "call anybody
[PNY] want[ed] who could lay a foundation for an expert to be able to say that, if there
were a contract entered, this is what would have been the savings to PNY."  (See id. at

---

[13]At the Pretrial Conference, the Court ordered all witnesses, with the exception of
experts and designated representatives of each party, excluded from the courtroom at all
times other than when testifying.  (See Tully Decl., filed February 3, 2017, Ex. B at 43:25
- 44:15.)  Afber was neither an expert nor a designated representative of PNY.

[14]In his expert report, Tregillis opined that PNY lost millions of dollars in profits as a
result of its inability to enter into a contract under which SanDisk would have agreed to
sell products to PNY at a rate lower than other suppliers.  (See Robinson Decl., filed
August 5, 2016, Ex. 40 ¶¶ 129-39.)

1271:21- 1272:2.)  Thereafter, PNY elected to call Cohen (see id. at 1281:5-8), and, at the conclusion of Cohen's testimony, the Court found his testimony sufficient and allowed Tregillis to offer the opinion at issue (see Trial Tr. vol. 7 at 1414:12 - 1417:16).

At no time during the above-described proceedings, or at any other time during trial, did PNY request to recall Afber, let alone make an offer of proof as to what additional testimony Afber would have given if recalled.  Had PNY made such a request, the Court would have considered Miller Kaplan's objection in light of the posture of the case at that time and the nature of Afber's anticipated testimony.  Given no such request by PNY was made, however, the Court had no occasion to consider whether circumstances might exist to warrant allowing Afber to be recalled irrespective of his presence in the courtroom during a discussion of the testimony he had given.

In sum, the Court finds PNY has failed to show any error was made with respect to Afber.

### c.  Miller Kaplan's Closing Argument

Before closing arguments began, the Court, in addressing a concern raised by PNY outside the presence of the jury, stated that Miller Kaplan could not, with respect to the emails the Court had excluded, argue in a manner that would "leave someone with the idea that something existed and [PNY] didn't put it in" (see Trial. Tr. vol. 9 at 1655:7-12), "as opposed to, gee, they don't have anything in writing" (see id.).  The Court explained that it would be inappropriate to state that "somebody doesn't give something that they can get their hands on," as that would suggest "a consciousness of a weak case," i.e., that "you've got it and you're not putting it in because you know it hurts you." (See id. at 1657:13-19.)

PNY argues it is entitled to a new trial because, it asserts, Miller Kaplan, in its closing argument, made misleading statements concerning PNY's lost profits theory in violation of the above-described ruling, and the Court erroneously overruled PNY's objections to said argument.  As discussed below, however, PNY fails to identify any misleading statements made by Miller Kaplan in its closing argument.

1   During Miller Kaplan's closing argument, the following occurred:

2   [Counsel for Miller Kaplan]:  You'll be shown a jury instruction, Introduction to Tort Damages, and it talks about lost profits, and it says a couple things.

3   One is PNY has the burden to prove that it actually lost profits with reasonable certainty; and, second, that you cannot speculate about

4   damages or what caused the damages.

5   So now let's quickly look at the evidence that you've got.  And basically all the evidence you've got are some secondhand comments from Mr. Cohen

6   about a conversation with Sanjay in May of 2011.  Cohen says there were negotiations, but he wasn't involved in them.  He says his team was.  The

7   head of purchases, Afber, he says, "I wasn't involved in them either."  Those were the only two witnesses they asked anything on.  PNY hasn't

8   identified who, what's the name of the person involved in the negotiations.  They haven't done that.  They certainly didn't call anybody who was

9   involved in those negotiations.  Cohen says that PNY and SanDisk insisted that there be a written agreement, because they didn't want a repeat of [the]

10   dispute in 2009.  But PNY produces no evidence of any contract whatsoever, much less what the terms might be.  And if we go to 10b, they

11   haven't produced a single document having anything to do --

12   [Counsel for PNY]: Objection.

13   [Counsel for Miller Kaplan]: I thought that was okay to state.

14   The Court:  I think it is as long as you're not suggesting that any document was withheld.

15   [Counsel for Miller Kaplan]: I'm not.

16   The Court: All right.

17   [Counsel for Miller Kaplan]: They  haven't provided you with a single document about anything concerning those discussions.

18   

19   Furthermore, look at it from the SanDisk point of view.  Cohen says he met with Sanjay about possible sales.  They haven't called Sanjay.  No

20   deposition testimony from him.  And you heard Brelsford.  PNY didn't ask any questions of Brelsford about this.  In fact, there's not a single SanDisk

21   document or witness about anything concerning these discussions.

22   [Counsel for PNY]: Objection again, your Honor.

23   The Court: I'll overrule.

24   (See id. at 1768:18 - 1770:4 (emphasis added.)

25   PNY argues the portions of the argument underlined above were "misstatements,"

26   and, additionally, were made "[d]espite the Court's specific rulings."  (See Pl.'s Mot. for

27   New Trial at 6:8-9, 19.)  PNY fails, however, to identify any misstatement, and, indeed,

28   the challenged portions of the argument were not misstatements, as PNY and SanDisk

1   never reached an agreement and PNY elected not to call any SanDisk witness at trial.

2   Nor were the challenged remarks made in violation of the Court's order, as they neither

3   state nor suggest that PNY was in possession of a proposed contract but declined to

4   offer it, or that PNY was in possession of other documents related to negotiations but

5   withheld them from the jury.

6        In sum, PNY has failed to show the Court erred in overruling PNY's objections to

7   the above-referenced argument.

8                   **d.  Conclusion as to Disruption in Contractual Negotiations**

9        Accordingly, PNY has failed to show it is entitled to a new trial on its theory that

10  Miller Kaplan's issuance of the audit report was a substantial factor in causing SanDisk to

11  end negotiations as to a possible sales agreement between SanDisk and PNY.

12                                    **CONCLUSION**

13       For the reasons stated above, PNY's motion for a new trial is hereby DENIED.

14       **IT IS SO ORDERED.**

15

16  Dated: March 20, 2017

17                                                       MAXINE M. CHESNEY
                                                         United States District Judge

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California